***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and argument before the Full Commission. The appealing party has shown good ground to reconsider the matter. Upon reconsideration of the evidence, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act. *Page 2 
2. Zickgraf Enterprises, Inc. is the employer, and Wausau is the carrier on the risk.
3. On July 26, 2005, plaintiff sustained a compensable work injury to her left upper extremity.
4. A Form 18 was filed on August 2, 2006, and a Form 33 was filed on or about August 17, 2007. A Form 33R was filed on or about November 9, 2007.
5. Plaintiff's average weekly wage was $340.00 per week, yielding a compensation rate of $226.44.
6. The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Plaintiff's medical records, including stipulation re: November 4, 2008 letter from Sylva Orthopaedic Associates, PA
 • Exhibit 3: Industrial Commission forms and filings
 • Exhibit 4: Parties' discovery responses
 • Exhibit 5: Job search log and documentation
 • Exhibit 6: DVDs of job videos
7. The report of February 4, 2008 evaluation of plaintiff by Randy L. Adams was accepted into evidence as Plaintiff's Exhibit 1.
8. The issues before the Commission are whether plaintiff is entitled to temporary total disability compensation for the period from January 17, 2006 through the present and ongoing; and whether plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. As of the date of the hearing before the Deputy Commissioner, plaintiff was 36 years old, with a date of birth of June 10, 1972. She was born in Mexico, where she completed high school, which is approximately the equivalent of completing the ninth grade in the United States. Plaintiff had been in the United States for about six and a half years. She has limited understanding of English and required an interpreter to testify at the hearing.
2. As an adult in Mexico, plaintiff was a homemaker. Since coming to the United States, plaintiff had worked in two restaurants, as a cook's helper and cleaning tables, before she began working with defendant-employer in April of 2005. In her work with defendant-employer, plaintiff relied upon Spanish-speaking co-workers to interpret for her.
3. Defendant-employer manufactures hardwood flooring. Defendant-employer's plant processes incoming lumber into hardwood floor slats that are 10 inches to 7 feet long and 1 ½ to 5 inches wide. The slats weigh from ½ pound to 3 pounds apiece.
4. The jobs at defendant-employer's plant are fast-paced production jobs. If a worker is too slow, he is replaced with someone who can do the job more rapidly. The workers are typically rotated from one position to another to provide flexibility in staffing, which is also helpful for production.
5. Prior to sustaining her compensable injury, plaintiff worked primarily as a packer. In this job, she used both hands to pack flooring as fast as she could. Plaintiff is right-hand dominant.
6. Plaintiff sustained an injury to her left arm on July 26, 2005 when a bundle of wood fell from several feet above her and struck her left arm. As a result of this injury, plaintiff had pain in her left shoulder and arm. Although defendants never filed a Form 60, they have *Page 4 
provided ongoing medical treatment for plaintiff's left arm and left shoulder conditions since the injury and have stipulated that plaintiff sustained a compensable injury to her left upper extremity on July 26, 2005.
7. Plaintiff began treating with Dr. Scott Baker on July 27, 2005. His exam revealed tenderness in the left clavicle and a contusion in the middle of the left arm, and he noted a left arm hematoma and left forearm contusion. Plaintiff complained of left dorsal hand and middle finger pain and shoulder pain and reported that she had tried to return to her regular job but had been unable to do so because of her pain.
8. Dr. Baker initially wrote plaintiff entirely out of work for one week. According to a notation on the out-of-work note, Dr. Baker changed plaintiff's work status to light duty upon the request of Patricia Green, defendant-employer's human resources manager. Plaintiff asked Ms. Green for time off, but Ms. Green told plaintiff that she would lose her medical treatment and might lose her job if she took time off. Therefore, plaintiff continued to work under light duty restrictions.
9. Plaintiff next came under the treatment of Dr. Michael Swaney, an orthopedist. As of August 30, 2005, Dr. Swaney's work restrictions for plaintiff were no lifting, pushing or pulling with the left arm; no overhead work or climbing; and maximum lifting of 2-3 pounds and pulling of 5 pounds with the right arm. Dr. Swaney ordered physical therapy.
10. On September 29, 2005, Dr. Swaney noted that plaintiff continued to have left shoulder pain, and he restricted her to continued light duty with minimal use of the left arm until further notice. Dr. Swaney continued these restrictions on October 26, 2005. *Page 5 
11. After her injury, defendant-employer's plant manager, Chris Norton, first assigned plaintiff to a wrapping job. Plaintiff was in a lot of pain doing this job and did it very slowly with one hand.
12. Subsequently, in August of 2005, Mr. Norton assigned plaintiff to a position as a "descrambler." Plaintiff's duties in this position consisted of standing next to a belt that carried pieces of flooring and straightening the flooring pieces as they went by. The straightening was done so that the belt would not jam up, which caused production delays.
13. Plaintiff had trouble keeping up with production requirements because she could not use her left arm. The pieces tended to bunch up and become stuck between conveyor belts every couple of hours or less, depending on the volume of wood coming down the belt. The volume depended on how fast the sawyers were cutting and the lengths of the pieces. The speed of the belt also varied.
14. Whenever pieces got stuck between belts, plaintiff had to yell at the sawyers to stop the belt. If plaintiff was able to free the jammed-up pieces with one hand, she threw them on the floor and could not easily get them back on the belt. Her co-workers tried to help her to free up the belt unless management complained. Production was interrupted from five to 20 minutes, depending on how badly the wood was stuck and how much help plaintiff received.
15. Mr. Norton described the descrambler job as "light duty." The job was one in which he placed new employees and employees who had been injured. As Mr. Norton testified, the descrambler was the easiest job in the plant and the only job that could be done one-handed, except possibly the strapping machine. The descrambler job required no lifting.
16. Defendants were unable to produce a written job description for the descrambler position. Although the descrambler position was supposed to be a fast-paced production job, *Page 6 
plaintiff was allowed to perform it at a very slow pace. As Mr. Norton testified, he probably would not have hired someone in plaintiff's condition to do the descrambler job.
17. Plaintiff was kept in the descrambler position until she was laid off, as part of a larger layoff, on January 17, 2006. After the layoff, the production line that plaintiff worked on was shut down entirely because the line was the least productive line.
18. Randy Adams is a certified vocational counselor with 23 years' experience in Social Security and workers' compensation and was tendered as an expert in vocational rehabilitation without objection from defendants. Mr. Adams determined that the descrambler job did not match any job description in the Dictionary of Occupational Titles. The closest position Mr. Adams found was "machine feeder," which is normally a medium level job requiring bilateral use of the upper extremities on a frequent basis. In all his experience, Mr. Adams had never seen a "descrambler" job offered as competitive employment. As Mr. Adams opined, a "descrambler" job that can be performed with one hand is a highly modified and accommodated position.
19. The Full Commission finds that the descrambler position that plaintiff performed after her compensable injury was so highly modified and accommodated that it did not show that plaintiff had wage-earning capacity in the competitive economy. Rather, the job was make-work until plaintiff's layoff. Further, plaintiff could not perform even the highly modified and accommodated descrambler position in a productive fashion, given the physical limitations and pain she had as a result of her compensable left arm condition. The modified descrambler position was not suitable employment for plaintiff.
20. Plaintiff has not worked for any employer since January 17, 2006. *Page 7 
21. On May 9, 2006, Dr. Swaney restricted plaintiff to no lifting over five pounds and no pushing or pulling with her left arm and no climbing. He opined that plaintiff was not yet at maximum medical improvement.
22. Plaintiff was then directed to Dr. Gordon Groh, an orthopedist, for another opinion. Dr. Groh recommended left shoulder arthroscopy, which plaintiff wanted to undergo. Dr. Groh again recommended shoulder surgery on October 6, 2006, but defendants did not authorize surgery.
23. Plaintiff saw Dr. Andrew Rudins for an independent medical examination on August 22, 2006. He diagnosed a left shoulder/upper arm contusion, left shoulder rotator cuff tendinitis, and chronic pain syndrome with elements of chronic regional pain syndrome in the lateral upper arm, combined with an element of symptom magnification. Dr. Rudins recommended physical therapy, home exercises, a functional restoration program, prescription of Cymbalta and/or Lyrica and a diagnostic cervical sympathetic block. He also recommended consultation with a pain psychologist to help address psychological factors likely responsible for symptom magnification. Dr. Rudins restricted plaintiff to no lifting greater than five pounds with her left arm and no overhead or repetitive use of her left arm.
24. Terence Fitzgerald, Ph.D., conducted a psychological evaluation of plaintiff in February of 2007. He determined that plaintiff was functionally illiterate in English. He noted extreme fear of re-injury, and he opined that her medical diagnosis of myofascial pain syndrome was consistent and was likely exacerbated by compensatory postures, disuse, fear of re-injury and incomplete understanding of her medical condition and palliative options. Adding to plaintiff's distress, in Dr. Fitzgerald's opinion, was her stated conviction that shoulder surgery is *Page 8 
her only viable alternative. He opined that plaintiff's MMPI testing results argued against any secondary gain motivations.
25. Plaintiff underwent a work conditioning program at the Center for Occupational Rehabilitation and was given a functional capacity evaluation on May 11, 2007. Before the FCE testing began, plaintiff received a paraffin bath for her left arm and aquatic exercises. That day, the evaluator opined that plaintiff could perform in the light-medium physical demand category. In accordance with the FCE recommendations, Dr. Rudins, who had by then become plaintiff's authorized treating physician, wrote that plaintiff could occasionally lift about 20 pounds with the left arm, and he recommended against any repetitive use of her left arm.
26. As Dr. Rudins testified, the May 11, 2007 FCE likely overestimated plaintiff's capacity. As Dr. Rudins further testified, at the time of the May 2007 FCE, plaintiff likely would not have been able to tolerate a job at a light physical demand level and her increased left arm pain would likely have resulted in an unsuccessful return to work.
27. Dr. Rudins found that plaintiff had reached maximum medical improvement as of June 13, 2007. He assigned an 8% permanent functional impairment rating to her left arm. Dr. Rudins stated that plaintiff's pain is real to her and affects her activities of daily living.
28. Plaintiff underwent a second FCE in June of 2008. As of plaintiff's August 1, 2008 visit to him, Dr. Rudins felt that plaintiff could do sedentary level work with unrestricted right arm work but no use of the left arm, consistent with the findings of the second FCE. Dr. Rudins felt that a reasonable explanation for plaintiff's worsened performance in the second FCE as compared to the first FCE was that plaintiff had just finished work hardening and a rehabilitation program at the time of the first FCE, and her post-injury function was then at its peak. *Page 9 
29. Dr. Rudins noted that Dr. Kern Carlton had found objective symptoms of CRPS in plaintiff's left arm on November 28, 2007. Those symptoms included purplish discoloration of the left hand and left forearm circumference of two centimeters less than the right. Dr. Carlton determined that plaintiff has CRPS. The Full Commission finds that plaintiff's chronic pain syndrome in her left arm is related to her compensable left upper extremity injury and is a compensable condition.
30. When Dr. Rudins examined plaintiff on August 1, 2008, he observed that she held her left arm in a protective position. He stated that if plaintiff did not move her arm and participate in a home exercise program, her pain and symptoms would worsen and her function would decline. Plaintiff's left arm function tended to improve somewhat while she was in physical therapy but worsened after therapy ended. Dr. Rudins did not think that plaintiff engaged in much home exercise of her left arm out of fear of re-injury. Dr. Rudins ordered pool therapy, which defendants did not authorize.
31. At the hearing before the Deputy Commissioner, plaintiff described the pain in her left arm as constant burning pain at an 8/10 level. Even wearing a shirt bothered her left arm, and plaintiff tended to get frustrated and depressed from the pain. Plaintiff's work history prior to her job with defendant-employer was in restaurants. Plaintiff testified that she does not believe that she can do restaurant work because she cannot use both hands in a fast-paced work environment.
32. Mr. Adams, the vocational expert, determined that plaintiff could read only at the second grade level and could do math only at the fourth grade level. Because of her intellectual and educational limitations, Mr. Adams stated that plaintiff could not effectively do clerical or sales work. Because of her inability to use her left arm, Mr. Adams believed that plaintiff could *Page 10 
not effectively do light industrial or service work, which require the bilateral use of the upper extremities.
33. The Full Commission finds that, although plaintiff would likely attempt to perform a job if one were offered to her, she would most likely not be able to do so in a satisfactory or productive matter because of her compensable left arm condition. The Full Commission further finds that there are no jobs in the competitive local economy that plaintiff can perform with her physical, educational and intellectual limitations.
34. Defendants did not defend this action without reasonable grounds.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On July 26, 2005 plaintiff sustained a compensable injury to her left arm arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. The descrambler position that plaintiff performed after her compensable injury was highly modified and thus was not suitable employment within her restrictions and did not show that plaintiff had wage-earning capacity in the competitive economy. Saums v.Raleigh Community Hospital, 346 N.C. 760, 487 S.E.2d 746 (1997).
3. After the layoff on January 17, 2006 until she reached maximum medical improvement on June 13, 2007, plaintiff was disabled from any employment and entitled to payment by defendants of temporary total disability compensation at the rate of $226.44 per week during this period. N.C. Gen. Stat. § 97-29. *Page 11 
4. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v. Perdue Farms, Inc., 143 N.C. App. 259,545 S.E.2d 485 (2001); Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
5. Based on plaintiff's limited work history, her limited English, her educational and intellectual limitations and the inability to use her left arm, since she reached maximum medical improvement it has been futile for plaintiff to look for work. As such, plaintiff has shown that she has been totally disabled since June 13, 2007, and is entitled to receive total disability compensation at the rate of $226.44 per week from defendants from June 13, 2007 and continuing until she returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29. *Page 12 
6. Plaintiff is entitled to have defendants authorize and pay for further medical treatment for her compensable left arm condition, including, but not limited to, the aquatic therapy recommended by Dr. Rudins. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
7. Defendants did not defend this claim without reasonable grounds and, therefore, plaintiff is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay to plaintiff temporary total disability compensation in the amount of $226.44 per week from January 17, 2006 and continuing until plaintiff returns to work or until further Order of the Commission. This amount has accrued and shall be paid in a lump sum.
2. Defendants shall pay for all medical treatment related to plaintiff's compensable injury that is reasonably likely to effect a cure, provide relief or lessen plaintiff's period of disability. Dr. Rudins is authorized as plaintiff's treating physician, and defendants shall authorize and pay for the treatment that he recommends for plaintiff's compensable left arm condition, including but not limited to, aquatic therapy, physical therapy, prescriptions, diagnostic testing, referrals and mileage.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted and paid directly to plaintiff's counsel. *Page 13 
4. Defendants shall pay the costs. As part of their costs, if they have not done so already, defendants shall pay an expert witness fee, in the amount shown or the amount actually billed, whichever is less, of $728.00 to Dr. Rudins and $344.00 to Mr. Adams.
This the ___ day of September 2009.
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ STACI T. MEYER COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER